## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS
## (EAST ST. LOUIS DIVISION)

| | | |
|---|---|---|
| **ED'S PALLET SERVICES INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. _____** |
| | ) | |
| **APPLIED UNDERWRITERS, INC.** | ) | **JURY TRIAL** |
| | ) | **DEMANDED** |
| **Defendant.** | ) | |

## COMPLAINT & REQUEST FOR
## PRELIMINARY INJUNCTION AND FOR DAMAGES

Plaintiff, Ed's Pallet Services, Inc. ("Ed's"), by and through counsel, states the following in support of its Complaint against Defendant, Applied Underwriters, Inc., requesting, *inter alia*: (1) issuance of a Preliminary Injunction ("PI"), later to be made permanent, enjoining Defendant from forcing Ed's to engage in certain arbitration proceedings; (2) a declaration that the parties' purported insurance agreement, as well as the arbitration provisions within, are invalid as a matter of law, *ab initio,* due to countless factors that by themselves, and especially cumulatively, render each procedurally and substantively unconscionable; (3) an order rescinding the invalid agreement; (4) disgorgement of all sums Defendant collected from Ed's pursuant to the invalid agreement and its purported extension, reduced by whatever amounts Defendant or one of its affiliates paid on Ed's behalf; and (5) an award to Defendant of compensatory damages, punitive damages, attorneys fees, statutory interest, and all other relief that the Court deems just and appropriate.

## I. PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Ed's Pallet Services, Inc. is a closely-held corporation organized and existing under the laws of Illinois, having its principal place of business in Albers, Illinois, within this judicial District.

2.      Defendant Applied Underwriters, Inc., is a Nebraska Corporation maintaining its

principal place of business in Omaha, Nebraska.

3.      Herein, Defendant Applied Underwriters, Inc. claims to be acting as the assignee of accounts payable owed by Ed's to "Applied Underwriters Captive Risk Assurance Company, Inc." ("AUCR"), a company purportedly organized and existing under the laws of the British Virgin Islands.

4.      For clarity and simplicity, and because Applied Underwriters, Inc. claims to stand in AUCR's shoes as "assignee" of certain "accounts receivable," the two entities will be referred to hereinafter collectively as "Defendant."

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), because complete diversity of citizenship exists between the parties, and the amount in controversy exceeds $75,000.00.

6.      Pursuant to 28 U.S.C. § 2201(a), this Court may declare the rights and other legal relations that are in actual controversy between Ed's and Defendant.

7.      Venue is proper in the Southern District of Illinois pursuant to 28 U.S.C. §1391(b), as a substantial part (the vast majority) of the events giving rise to the claims in this action occurred in this judicial District.

8.      This forum also is superior in convenience to any other, as almost all of the relevant documents and witnesses involved in the transaction were and, upon information and belief, remain in this District and/or (in the case of documents) can be relatively easily copied and transmitted to this District.

9.      Defendant may argue the parties' agreement requires venue to be held in Nebraska in the event the matter is not arbitrated – which Defendant is now improperly attempting to commence.

10.      Yet because both the arbitration provision and the agreement containing that

arbitration provision are invalid *ab initio* – as each are unconscionable as a matter of law for the reasons described below – the choice-of-law provision, as is the case with all of the agreements' provisions, is inapplicable.

11.     Thus, this Court should declare the same – that the arbitration provisions and the agreement are invalid due to unconscionability – and enjoin Defendant from continuing the arbitration proceedings it already has commenced against Ed's.

12.     In addition, because the agreement (along with its purported extension) is unconscionable and invalid *ab initio*, it should be deemed rescinded and Defendant should return to Ed's all monies that Ed's has paid to Defendant, offset by whatever amounts Defendant actually paid out on Ed's behalf.

13.     Additionally, Defendant is liable for its tortious, deceptive conduct that fraudulently induced Ed's to enter the agreement in the first place, while wholly ignorant of the multiple obscured, unconscionably one-sided and onerous provisions therein.

## II. <u>BACKGROUND</u>

14.     Ed's provides a number of services and products relating to the selling and leasing of commercial shipping pallets.

15.     Due to the fact Ed's has multiple employees, Ed's is subject to the Illinois workers' compensation laws requiring Ed's to maintain workers' compensation insurance.

16.     In order to satisfy its obligations under those workers' compensation laws, Ed's maintains workers' compensation insurance.

17.     On February 24, 2009, near the time that Ed's existing workers' compensation insurance coverage was coming to the end of its term, Ed's place of business was visited by one Marvin Gerdes, who claimed to work as a personal financial consultant, and who distributed, among other financial products, workers' compensation insurance for small businesses such as

Ed's.

18.     One product Mr. Gerdes presented to Ed's was Defendant's March 31, 2009 "Reinsurance Participation Agreement," including its attached "Schedules," hereinafter the "Agreement"). **Underline A**.[1]

19.     Mr. Gerdes, while a key witness, is not a necessary party to this lawsuit, as Defendant itself *directly* convinced Ed's representatives to enter the Agreement, as explained below.

20.     Even a cursory reading of the Agreement reveals that it contains so much legalese, and is written in such an overall confusing and deceptive manner, that no reasonable non-attorney could be expected to fully understand its terms.

21.     Indeed, many of the Agreement's provisions are so obtuse and vague as to be largely incomprehensible even to an attorney, and appear written *intentionally* to confuse and/or deceive the reader.

22.     As just one example (additional examples are given below), when discussing how Ed's premium payments would be calculated, the Agreement describes a calculation so esoteric and involving so many terms of art, that it is outrageously unclear and confusing. Exhibit A, "Page 7 of 10," ¶2(a).

23.     As illustrated, this determination includes amongst its multiple terms of art the term "Cumulative Aggregate Limit," which apparently equals "0.9900 multiplied by the Loss Pick Containment Amount." *Id.*

24.     That statement is an intentionally obtuse way of saying simply that "Cumulative

---

[1] Ed's purportedly agreed to an extension of the Agreement with Defendant.  For whatever reason, Defendant has chosen to rely upon the 2009 Agreement in its attempt to have this matter arbitrated, however. Thus only that Agreement is the focus of the present matter. That said, any later agreement also is invalid for many of the same reasons discussed herein.

Aggregate Limit" and the "Loss Pick Containment Amount" are nearly identical.

25.     This semantic tactic speaks for itself; it is hard to imagine any legitimate need for the provision described above, which effectively just provides for multiplying a term of art by "1" ("0.99") and then changing the term of art's label.

26.     The overuse and confusion created by so many terms of art are but a fraction of the almost countless deceptive and onerous provisions in the Agreement, the vast majority of which are carefully obscured from any reasonable layperson, unexpected, outrageous and material, yet were never disclosed by Defendant at the purported time Ed's entered the Agreement.

27.     In light of how confusing the Agreement's terms are, Mr. Gerdes admitted to Ed's representatives that even he did not really understand how the Agreement worked, but invited Ed Wuebbels, Sharon Wuebbels, and Marvin Wuebbels to listen in and speak, on speakerphone and in Mr. Gerdes' presence, to an individual who identified themselves as one of Defendant's representatives.

28.     The call was initiated by Mr. Gerdes, from Ed's office at Ed's business in Illinois.

29.     Over the phone, Defendant's representative gave a sales pitch regarding the Agreement's terms and all of the purported benefits of the plan the Agreement created and governed, the bottom line of which was that Ed's would save money on its worker's compensation insurance by experiencing, if not immediately, then in the long run, noticeably lower monthly premium costs; and, as a bonus, would further reap financial rewards from participating in Defendant's unique "reinsurance" participation program, created and governed by the Agreement's terms in its Schedule 1.

30.     Defendant is liable because an individual that indisputably was Defendant's representative, on the call, affirmatively misled Ed's representatives regarding the Agreement's true terms and effect.

31.     Defendant also is liable through agency principles through Mr. Gerdes, who, for purposes of the transaction, was an agent of Defendant.

32.     Under Illinois law, in the insurance context, "there are situations in which an insurance broker can act as the agent of the insurance company …" *State Security Insurance Co. v. Burgos,* 145 Ill.2d 423, 431 (Ill. 1991), cited by *First Chicago Insurance Co. v. Molda,* 2015 Ill. App (1st) 140548 (June 26, 2015)(collecting case citations of additional Illinois decisions spanning approximately a century, along with leading insurance treatises on the issue supporting the point).

33.     Mr. Gerdes was clothed in Defendant's apparent authority, if not more, which Defendant obviously, through its telephone sales call, in conjunction with Mr. Gerdes physical appearance at Ed's business, acquiesced in and ratified.

34.     In addition, Mr. Gerdes obviously was authorized to distribute pre-executed "blank check" versions of the Agreement, already signed by a "Robert Stafford," Defendant's purported Vice President, Exhibit A, "Page 6 of 10."

35.     Thus, Defendant is liable for misleading Ed's both directly through its employee and, in the alternative, through its agent for purposes of the transaction, Mr. Gerdes.

36.     In either event, in discussing the Agreement with Ed's representatives, Defendant's spokesperson misrepresented to Ed's that Ed's would save substantial money pursuant to the Agreement and that it presented a good deal as far as workers' compensation insurance policies were concerned.

37.     Pointedly, Defendant, neither on the phone, nor through Mr. Gerdes, ever spoke of the Agreement's numerous material and highly onerous contractual "landmines" exclusively detrimental to Ed's, as explained in further detail below.

38.     Defendant did not tell Ed's of the extremely onerous terms hidden in the Agreement (discussed in greater detail, *infra*), including, *inter alia*: an outrageously high and

arbitrary early cancellation penalty, multiple unexpected charges, a purported waiver by Ed's of essentially *all* of its legal rights against Defendant immediately upon entering the Agreement, many additional lopsided provisions, including the Agreement's most heavily-abused provision: Defendant's purported right to unilaterally and arbitrarily determine Ed's monthly premium payments, using a complex "formula" that not only is intentionally confusing, but also ultimately seems to allows Defendant to charge **nearly any amount Defendant chooses, in its sole discretion.**

39.     Moreover, one of the factorials that is key to each determination, the "Loss Pick Containment Rate," ultimately appears wholly arbitrary.

40.     Also tainting the entire transaction is the fact Defendant, neither directly nor through Mr. Gerdes, revealed to Ed's that Defendant was not even licensed to engage in the business of insurance in Illinois in 2009 when it contracted with Ed's.  This fact alone should wholly invalid the agreement.

41.      Ed's also was not informed that the purported "insurance" and/or "reinsurance" programs outlined in the Agreement had not been approved by the Illinois Department of Insurance.

42.     Most likely, Defendant's products would not have been approved, as the Agreement, *inter alia,* illegally two policies failed to provide Ed's a choice between varying deductible payments, a clear un-waivable violation of Illinois insurance law governing the sale of workers' compensation insurance policies to small businesses of Ed's size; this is yet another potential fact that, by itself, invalidates the Agreement in its entirety.

43.     Defendant never suggested to Ed's representatives that Ed's should have separate counsel review the Agreement, and instead encouraged Ed's to execute the Agreement following the teleconference which Mr. Gerdes approached Ed's and Defendant made its telephone sales

pitch.

44.     Defendant also never informed Ed's that the Agreement contained a binding portportedarbitration provision (hereinafter, the "Arbitration Agreement"), which Defendant now is attempting to enforce, but which is, for the reasons mentioned below, invalid.

45.     Defendants commencing the arbitration proceedings **necessitates the relatively emergency nature of these pleadings and Ed's request for, *inter alia*, a Preliminary Injunction**. That said for the convenience of all involved, Ed's is happy to agree to a regular hearing setting, if Defendant is willing voluntarily stay the arbitration proceedings.

46.     Ed's reasonably relied on Defendant's multiple material nondisclosures regarding the Agreement's multiple, largely-hidden unconscionable provisions.

47.     Ed's also reasonably relied upon Defendant's misleading statements as to the Agreement's many claimed benefits (which Ed's never saw).

48.     Defendant's telephone representative and Defendant's agent, Mr. Gerdes, had tremendous informational advantages over Ed's in relation to the Agreement, were aware of this fact, and thus each had a fiduciary duty to reveal the Agreement's multiple material and unexpectedly onerous terms to Ed's prior to its entering the Agreement.

49.     Defendant purposely did not disclose those material facts to Ed's in order to induce Ed's into entering the Agreement under false pretense.

50.     Each of the Agreement's undisclosed, onerous provisions discussed herein were not something any reasonable individual or entity in Ed's position would expect to see in such an Agreement.

51.     Moreover, such terms are carefully crafted so as to make disclosures, yet in a manner that is unlikely to be understood by a reasonable layperson. This indicating design and intent on the part of Defendant in drafting the Agreement.

52.     In reliance on the nondisclosures and misrepresentations made by Defendant, Ed's entered into the Agreement: Ed Wuebbels, Ed's President, executed the Agreement on April 24, 2009 closely following the teleconference with Defendant's spokeperson.

53.     When signing the Agreement and performing its general terms (*i.e.* – paying Defendant monthly premiums), Ed's remained unaware the agreements onerous nature until 2014, when the outrageous "cancellation fee," was demanded, and Mr. Wuebbels's hired counsel to scrutinize the esoteric Agreement.

54.     It was not until 2014 that Ed's was able to discover, with the aide of counsel from two separate firms, just how one-sided, deceptive, and illegal the Agreement really is.

55.     For statute of limitations purposes, no period began to accrue until that recent discovery.

56.     Moreover, any statute of limitations that might have accrued prior to the Agreement's cancellation was tolled until cancellation due to Ed's being in a fiduciary relationship with Defendant.

57.     In Illinois, as in most states, a statute of limitation is tolled as to a claim against fiduciary so long as that fiduciary relationship exists, regardless of a potential plaintiff's knowledge of such a claim.

58.     Ed's never would have entered the Agreement if the Agreement's material and onerous terms had been disclosed to Ed's by Defendant.

59.     Pursuant to the Agreement, Defendant was to bill Ed's on a monthly basis for premiums purportedly due to Defendant under the Agreement.

60.     Ed's also was required under the Agreement to make a large initial cash deposit with Defendant that Ed's was led to believe would be refunded, at the latest, when the Agreement ended; according to the Agreement's cryptic terms, however, such amount may be retained (and is

being retained) by Defendant for up to *seven* years following an agreement's cancellation.

61.     From the beginning and throughout, Ed's relationship with Defendant was irregular and confusing to Ed's.

62.     As just one example, the premiums Defendant billed to Ed's varied in amount, sometimes widely and without explanation, from one month to the next.

63.     From time to time, usually when a monthly premium bill from Defendant was particularly high, Ed's would call Defendant to inquire as to why this was the case.

64.     Doing so consistently proved to be a fool's errand: Ed's representatives, despite contacting Defendant numerous times, never received any explanation for the premium fluctuations other than conclusory platitudes such as "the Agreement allows for it."

65.     Moreover, despite Defendant having assured Ed's that his premiums would decrease pursuant to the Agreement, this never became true.

66.     To the contrary, the premiums became so high that Ed's often struggled to pay them, even being forced to have to delay and/or recall a handful of payments over the years.

67.      Nonetheless, excluding its approximately $100,000 outstanding bill, Ed's dutifully paid Defendant all sums that Defendant ever claimed were owed pursuant to the Agreement for approximately five years.

68.     Over the lifetime of the Agreement with Defendant (which Defendant unilaterally "renewed" in 2012), Ed's paid to Defendant hundreds of thousands of dollars in premiums and deposits.

69.     Upon information and belief, Defendant and/or Defendant's affiliates have paid out a mere fraction of the total amount collected from Ed's in order to cover workers' compensation claims by Ed's employees.

70.     In early 2014, Ed's was tardy on a monthly premium payment purportedly owed

to Defendant.

71.     Despite Ed's ultimately being able and willing to pay the entire amount due for the premium that month, Defendant refused to accept Ed's offer of payment, instead sending to Ed's a "Notice of Cancellation" for nonpayment, dated February 4, 2014, stating further that Defendant would be reviewing Ed's policy to determine what amounts Ed's might owe to Defendant.

72.     Ed's representatives attempted multiple times to resolve the issue with Defendant's "customer service representatives" by telephone, making it clear to Defendant that Ed's was willing and able to pay the tardy premium, and fervently requesting that Defendant not follow through with its threatened abrupt cancellation of coverage.

73.     Defendant ignored these requests, never reinstating coverage.

74.     As a result of Defendant's premature, bad faith, and unwarranted cancellation of the Agreement, Ed's was forced to scramble to obtain workers' compensation coverage from another insurer.

75.     Worse, however, on July 31, 2014, Ed's was shocked and appalled to receive a letter from Defendant informing Ed's that it owed Defendant a "TOTAL AMOUNT DUE" of $100,085.70. *See* **Exhibit B.**

76.     Over the next few months, Ed's again spoke with Defendant's representatives in an attempt to resolve the dispute, as no one at Ed's could determine the reason for such a high charge.

77.     Ed's was and remains unable to determine exactly why Ed's allegedly owes Defendant such an outrageously high "cancellation" fee, among many other unexpected charges Ed's has been told to Defendant.

78.     When Ed's explored why the cancellation fee was so high with Defendant's

11

representatives by telephone, Defendant's own representatives could not explain to Ed's the basis for the charged "Total Early Cancellation Charge," approximately $45,000 in this case, a completely unexpected and outrageous amount, especially in light of the economic scale in which Ed's, a small business, operated.

79.     In stark contrast to Defendant's relative indifference to providing Ed's with any explanation for why Ed's purportedly owed Defendant the excessive amounts, Defendant has been aggressive, focused and diligent in attempting to force Ed's to pay the outrageous fee.

80.     On or about July 20, 2015, after having made various interim demands for payment, Defendant's Secretary and General Counsel, Jeffrey Silver, mailed a copy of a letter to Ed's, informing Ed's that Defendant had filed a Demand for Arbitration with the American Arbitration Association located in New Jersey. *See* **Exhibit C**.

81.     Pursuant to that letter (*see id.*), according to Defendant, the "Arbitration Agreement" provisions appeared in the Agreement Defendant's counsel attached to the Arbitration Demand, the same 2009 Agreement discussed throughout this Complaint. *See* Exhibit A; Exhibit C.

82.     Defense counsel recently has requested that Ed's engage in arbitration proceedings in Chicago (Illinois) – a venue not even mentioned in the Agreement's confusing and contradicting venue provisions – to defend itself against Defendant's attempt to collect the approximately $100,000.00 Defendant claims is due. *See* Exhibit C.

83.     According to Defendant's filing, said arbitration will take approximately two days. *See id.*

84.     Ed's has not engaged in the arbitration proceedings other than to seek extensions of time.

### *This Court Must Enjoin the Arbitration Proceedings*

85.     Because the purported Arbitration Agreement, as well as the Agreement in which it is contained, are both unconscionable as a matter of law, the Arbitration Agreement is invalid *ab initio,* and no arbitration must be had.

86.     Therefore, Ed's requests that this Court declare the same, enjoin Defendant from any further participation in the arbitration Defendant already commenced pursuant to the illegal Agreement, order rescission of the invalid Agreement and disgorgement of Defendant's profits, punitive damages, attorneys fees, and such other relief as is appropriate.

### *The Purported Arbitration Agreement is Unconscionable and Thus Invalid.*

87.     The provisions in the Agreement that Defendant purports require arbitration, the collective "Arbitration Agreement," is not legally valid, as it is unconscionable as a matter of law.

88.     When a party challenges the **<u>validity</u>** (as opposed to, for instance, the enforceability) of a purported agreement to arbitrate, a **<u>court</u>** (not an arbitrator) decides the question, applying the relevant state law principles that govern the formation of contracts. *First Options of Chi. v. Kaplan,* 514 U.S. 938, 944 (1995).

89.     Here, in a diversity matter, the Court should apply the law of its forum state, Illinois, regardless of any term in the Arbitration Agreement or the overall Agreement, because each are inapplicable as the Agreement (and <u>all</u> of its provisions) are invalid *ab initio.*

90.     General state-law contract defenses such as fraud, duress, or **unconscionability** may invalidate arbitration agreements, allowing a party to avoid having to arbitrate his dispute. *Doctor's Assocs. v. Casarotto,* 517 U.S. 681, 687 (1996).

91.     There are two forms of unconscionability under Illinois law: substantive and procedural: "[a] finding of unconscionability may be based on either procedural or substantive unconscionability, or a combination of both." *Kinkel v. Cingular Wireless LLC,* 857 N.E.2d 250,

267 (Ill. 2006)(internal quotation marks omitted), citing *Razor v. Hyundai Motor Am.,* 854 N.E.2d 607, 622 (Ill. 2006).

92.     Under Illinois law, either form of unconscionability, **by itself**, is sufficient to render a contract unlawful. *Razor,* 854 N.E.2d at 622 (Ill. 2006).

93.     Here, the Arbitration Provision is both procedurally and substantively unconscionable.

### The Arbitration Provision is Procedurally Unconscionable

94.     Procedural unconscionability exists when a contract provision is so difficult to locate, read, or understand that a party "cannot fairly be said to have been aware he was agreeing to it." *Id.* (quoting *Razor,* 854 N.E.2d at 622).

95.     That was precisely the case here.

96.     Procedural unconscionability analysis takes into account the relative bargaining power of the parties to the agreement and inquires whether there has been "some impropriety during the process of forming the contract depriving a party of a meaningful choice." *Razor,* 854 N.E.2d at 264.

97.     "Factors to be considered in determining whether an agreement is procedurally unconscionable include whether each party had the opportunity to understand the terms of the contract, whether important terms were hidden in a maze of fine print, and all of the circumstances surrounding the formation of the contract." *Phoenix Ins. Co. v. Rosen,* 949 N.E.2d 639, 647 (Ill. 2011).

98.     Here, *inter alia*:

•     The circumstances surrounding the formation of the purported Arbitration Agreement include the fact that it was an agreement of adhesion, presented in a deceptive manner by essentially two

14

separate salespeople for Defendant, each of whom encouraged Ed's representatives to execute the Agreement the same day it was presented – which certainly qualifies their approach as "high pressure;"

- As noted, few, if any, of the Agreement's material terms were disclosed, particularly those most-disadvantageous to Ed's, including the existence of the Arbitration Agreement, as well as its onerous requirements;

- In fact, not one of the three individuals present for the telephone sales pitch on behalf of Ed's recalls any mention whatsoever of a binding arbitration requirement or a cancellation fee anywhere *near* the lofty amount that Defendant charged Ed's;

- the Arbitration Agreement terms are relatively hidden from the reasonable layperson, as they are obscured in subsections to a paragraph that confusingly appears to relate to issues other than arbitration ("Nothing in this section shall be deemed to amend or alter the due date of any obligation under this Agreement…"), or, at most, be of limited scope and importance ("this section *is only* intended to provide mechanism for resolving *accounting disputes* in good faith.") *See* Exhibit A, "Page 3 of 10," at ¶13[A];

- the "Arbitration Agreement" provisions, moreover, inconspicuously begin at the very bottom of a page in the Agreement, *id.*;

- Confusingly, the language introducing the Arbitration Agreement

15

also refers to a portion of the Agreement that **does not even exist**, a "sub-paragraph (B) of Paragraph 12," *id.*;

- There is no caption, title, capitalized, bolded, or otherwise emphasized language referring to arbitration of disputes to make such provisions stand out from the overwhelming amount of legalese preceding the same; *see generally, id.*;

- While it goes to substantive as well as procedural unconscionability, the Arbitration Agreement purports to require that arbitration "shall be fully determined in the British Virgin Islands …"; travel costs from the U.S. to the Virgin Islands, which takes roughly a full day of travel (nearly seven hours of flight time) alone provides Defendants with plenty of false leverage from a cost-benefit basis to force a party to pay Defendant even if they have a good faith belief the payment of such amount is unwarranted; *id.* "Page 3 of 10" through "Page 4 of 10";

- Moreover, requiring arbitration in the Virgin Islands is extremely one-sided in Defendant's favor in light of the fact that Defendant claims to be a Virgin Islands-based company and likely has competent legal representatives *already in* the Virgin Islands, making the burdens of sending a representative to such a remote location a potential risk *only* for Ed's;

- Additionally, the Agreement's "first" Virgin Islands venue requirement is even more dubious in light of the fact that on the

16

very same page of the Agreement, "Page 4 of 10," Paragraph 13(I) directly contradicts the exclusivity of venue in the Virgin Islands, providing: "All arbitration proceedings … shall take place in Tortola, British Virgin Islands, *or at some other location agreed to by the parties.*"

• This provision not only injects ambiguity into the Agreement, but it also always allows Defendant the upper hand throughout the life of the Agreement in that Defendant, in its sole discretion, could simply "refuse to agree" to another location proposed by Plaintiff in order to force arbitration to occur in the Virgin Islands where Defendant likely already has representatives.

99.    For the above-stated reasons and more, the Arbitration Provision is procedurally unconscionable as a matter of law: the "contracting process" that applied to the purported "Arbitration Agreement" bears all the hallmarks of procedural unconscionability. *See, e.g., Timmerman v. Grain Exch.,LLC*, 915 N.E.2d 113, 120 (Ill. App. Ct. 2009) (enumerating factors supporting procedural unconscionability).

**The Arbitration Provision is Substantively Unconscionable**

100.    In Illinois, substantive unconscionability concerns "the actual terms of the contract and examines the relative fairness of the obligations assumed. Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 267 (Ill. 2006)(internal quotation marks omitted).

101.    The Arbitration Provision is substantively unconscionable as a matter of law.

17

102.   Here, *inter* alia:

- As mentioned, the arbitration clause requires that arbitration be held in "Tortola, British Virgin Islands" exclusively and then, creating ambiguity, in the Virgin Islands or some other locations "as agreed to" by the parties; as the cost of simply traveling to the Virgin Islands would be extremely cost-prohibitive, yet Defendant presumably already has a corporate representative in the Virgin Islands, Defendant could heavily abuse this clause to create leverage, especially against a financially-strapped company that might see the cost of sending a representative to the Virgin Islands as so prohibitive to an extent those struggling companies will pay Defendant amounts it knows it does not actually owe, in lieu of incurring such travel costs and still potentially having to pay the full amount demanded by Defendants, however unlikely that prospect may be; Exhibit A at ¶13(A), viewed in context and in light of its surrounding terms, this an especially lopsided arrangement that no reasonable individual would have knowing agreed to;

- Moreover, the requirement that any arbitrators be active or retired officers of insurance or reinsurance companies virtually guarantees all claims will be arbitrated by individuals identifying with *Defendant*, and, if Defendant were to force arbitration to occur in the Virgin Islands, it is highly likely that any insurance or reinsurance officials familiar with the provisions of the American

Arbitration Association and the U.S. legal system are relatively few in number such that any qualified arbitrators and that those located in the Virgin Islands most likely already has worked with Defendant;

- The Arbitration Agreement, without explanation, only allows an award to be enforced by a *Nebraska* Court, which is particularly problematic when a company claims to be located in the Virgin Islands; and it is otherwise an artificially restrictive requirement that unfairly benefits only Defendant, which claims to operate out of, *inter alia,* Nebraska; *id.* ¶13(G);

- Shockingly, according to the language of Paragraph 13(M), Defendant apparently is exempt, if it so chooses, from arbitration, and may seek a judicial remedy at its option, despite the fact Ed's purportedly is bound **only to arbitrate**; *id.* at ¶13(M);

- The Arbitration Agreement purports to be binding even if the Agreement itself is invalid, which would be wholly illegal; *id.* at ¶13(K); and

- The Arbitration Agreement precludes the award of punitive damages; *id.* at ¶13(L); this provision, in conjunction with the Agreement's general waiver by Ed's of any claim for an amount beyond what Ed's itself paid Defendant, makes it so that Ed's is left with essentially no ability to recover, beyond essentially a "refund" of its own monies, for any improper acts committed by

19

Defendant; such a contractual arrangement offends public policy, is unexpected and is unconscionable.

103.     In light of all of factors delineated herein, and many others to be presented as evidence at a hearing or at trial as to these issues, the purported "Arbitration Agreement" is clearly unconscionable.

104.     Under Illinois law, a contract is invalid *ab initio* if it is either procedurally *or* substantively unconscionable; here, the Arbitration Agreement is both.

105.     Thus the Arbitration Agreement clearly is invalid.

106.     Accordingly, this Court should enjoin Defendant from continuing to improperly move forward with the arbitration proceedings it has instituted against Defendant.

107.     To the extent any doubt remains as to the invalidity of the Arbitration Agreement, the landslide of factors rendering the Agreement as a whole procedurally and substantively unconscionable should alleviate all doubt.

108.     Under Illinois law, the determination of potential contractual unconscionability is a "totality" review, whereby a Court should take into account all circumstances attendant to the purported unconscionable contract and/or portion thereof.

109.     Foremost in importance amongst the myriad circumstances surrounding an arbitration provision is the validity of the contract in which the provision is located.

110.     Here, not only is the Arbitration Agreement unconscionable, but also the Agreement as a whole is unconscionable, firmly cementing the invalidity of the purported Arbitration Agreement and invalidating the Agreement in its entirety.

### The Agreement As a Whole is Procedurally Unconscionable

111.     As an initial matter relating to the Agreement as a whole, although the Agreement is characterized as a "reinsurance participation agreement," it certainly is not, as it is beyond

dispute that Ed's is not an insurer.

112.    To the extent the Agreement represents a legitimate financial product of *any* sort it is most-similar to a flawed "retroactive" workers' compensation insurance policy.

113.    In the simplest of terms, under such a policy, an initial deposit is given by the insured to the insurer to serve as a "reserve," and then monthly premium payments for a given year are calculated pursuant to an insurer's good-faith audit of the employer's payroll and claims history during the years preceding the year for which the estimate is being conducted.

114.    Normally, this is done by using commonly-relied-upon, relatively objective data metrics.

115.    Here, the Agreement generally provides for the same sort of arrangement: Defendant's premium ostensibly is determined by extrapolating from objective data and rates commonly used in the industry to make such calculations.

116.    ***However,*** perhaps the single biggest factor rendering the Agreement wholly unconscionable is that it uses a calculation that goes beyond a typical determination process, multiplying the results by a factorial, the "Loss Pick Containment Rate," that appears to be entirely arbitrary.

117.    In addition, after carefully analyzing Defendant's monthly statements sent to Ed's, it appears that, ultimately, the premium amounts are not based on a standard formula, but rather appear to have been chosen arbitrary.

118.    Defendant's refusal to reveal what formula it *actually* uses to determine what premiums and/or "cancellation fee(s)" it will charge to a customer such as Ed's renders it impossible for Ed's to anticipate what its upcoming premiums might be and/or determine whether Defendant's charges are legitimate.

119.    On the other hand, Defendant's undisclosed formula and its use of arbitrary

factorials allowed Defendant to charge Ed's whatever amount Defendant decided, in its sole discretion.  This is one more factor by itself capable of rendering the Agreement wholly invalid as an illusory contract.

120.    Moreover, this factor strongly tilts the scales toward a finding of procedural unconscionability because it reveals that Defendant *knew* it would be able to manipulate the cost of Ed's premiums at the time that it made the false claim to Ed's that the Agreement would lower Ed's monthly premiums.

121.    As noted: "[f]actors to be considered in determining whether an agreement is procedurally unconscionable include whether each party had the opportunity to understand the terms of the contract, whether important terms were hidden in a maze of fine print, and all of the circumstances surrounding the formation of the contract." *Phoenix Ins. Co.,* 949 N.E.2d at 647.

122.    Not only was Ed's unable to understand the ultimately hidden formula purportedly used to calculate premiums delineated in the Agreement, but also Ed's affirmatively and knowingly was misled by Defendant as to what his premiums payments would be under the Agreement.

123.    In addition to the above, as well as the obvious fact that the Agreement also contains a purported Arbitration Agreement that, as shown herein, is onerous and invalid, *inter alia*:

>    • The numerous hallmarks of procedural unconscionability relating to the Arbitration Agreement delineated *supra* also apply to the Agreement as a whole – the Agreement was entered into under pressure, in the same meeting during which Defendant purposefully concealed and/or misrepresented the Agreement's

materially onerous terms;

• The Agreement as a whole is extremely confusing, in one part even using language generally found in securities private placement offerings, <u>Exhibit A</u> at ¶3;

• The Agreement was non-negotiable and thus a contract of adhesion;

• In retrospect, it is clear Defendant directly told Ed's that it would save money on premium payments, all the while intending to use the indecipherable Agreement to instead ultimately cause Ed's to pay more than Ed's had been paying prior to signing the Agreement;

• Moreover, another expressly recognized hallmark of procedural unconscionability, as noted, is "important terms [] hidden in a maze of fine print." *Phoenix Ins. Co.,* 949 N.E.2d at 647; the Agreement is rife with examples of the same; a sample of *multiple*, in no specific order, are discussed below; each is unexpected, onerous, and one-sided in addition to being "hidden" in the maze of legalese that is the Agreement.

124. For the above-stated reasons and more, the Agreement in its entirety, for largely the same reasons as is the Arbitration Agreement, is procedurally unconscionable as a matter of law – the purported contracting process bears all the hallmarks of procedural unconscionability. *See, e.g., Timmerman v. Grain Exch.,LLC*, 915 N.E.2d 113, 120 (Ill. App. Ct. 2009).

### *The Agreement as a Whole is Substantively Unconscionable*

125. Indicative of substantive unconscionability are contract terms so one-sided as to

oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity. *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 267 (Ill. 2006)(internal quotation marks omitted).

126.    The Agreement as a whole is substantively unconscionable as a matter of law.

127.    Here, *inter alia*, the Agreement, while first appearing more-or-less benign, contains countless unequal, unexpected, and unreasonable provision, most of which are linguistically "buried" in the Agreement, which is, for the most part, a "maze of fine print":

- Pursuant to the complex legalese in Paragraph 2 on the very first page, Ed's effectively waives all rights to sue or make any claims against Defendant whatsoever beyond receiving what would amount to a "refund," Exhibit A at "Page 1 of 1," ¶2; this provision benefits and protects Defendant while limiting Ed's rights, but not vice-a-versa; the provision benefits only Defendant;

- Despite being labeled a "Reinsurance Participation Agreement," it is clear the Agreement helps to form a pyramid investment scheme of some sort, not to provide excess lose insurance to an insurer – the role of "reinsurers" – because Ed's indisputably is not an insurer; *see id.,*

- The terms of any "Extension Period," which automatically follows the initial Agreement's term are so lopsided that the Agreement arguably is illusory as a result of this fact alone; during the Extension Period: (a) Defendant exclusively determines premiums to be paid; (b) Ed's is required to make an additional

cash deposit (the amount of which Defendant may manipulate); and (c) Ed's must pay a large "cancellation fee," **in spite of the fact the Agreement** would simply continue; *id.,* at "Page 2 of 10";

- The Agreement grants Defendant an absolute security interest, and full, secured ownership rights to Ed's entire "deposit," immediately upon execution of the Agreement; *id.* at ¶10;

- Moreover, under Paragraph 6 of Schedule 1 to the Agreement, the Company reserves the right to terminate the agreement – which purportedly allows the enormous termination fee Ed's was charged – in its "sole discretion" if, *inter alia,* "the Company deems itself insecure with respect to the Participant's [compliance with the Agreement]," a completely arbitrary standard that Defendant easily could abuse and which is not available to Ed's;

- In Paragraph 4 on "Page 2 of 10," Ed's apparently "waives" his right to be presented with a choice of deductible levels in violation of Illinois law; Ed's waiver does not cure the fact that such a provision is wholly illegal and to Defendant's detriment;

- Paragraph 16 of "Page 5 of 10" refers to "dispute resolution" terms in "Paragraph 12" that in fact do not even exist in Paragraph 12 of the Agreement; and

- Under the heading, "Calculation of benefits and loss amount" Paragraph 2(a)(at "Page 7 of 10"), the Agreement provides an extremely complicated description, employing at least six terms

25

of art (one of which is essentially the same as another) of how a premium amount is determined; as pointed out *supra,* the only firm conclusion that can be drawn from a review of that description and Defendant's monthly premium bills is that a specific formula *does not appear to apply*, which begs the question as to exactly how Defendant determines what it will charge each customer – the answer to that question is so integral to the entire Agreement that Defendant's failure to provide the same, by itself, renders the entire Agreement illusory and thus invalid.

128.    The above provisions, which are just a few of the numerous onerous terms in the Agreement, are unexpected, material, and outrageously one-sided, individually and especially collectively, rendering the Agreement as a whole substantively unconscionable.

129.    Consequently, the Agreement, in its entirety, is invalid as a matter of law.

130.    This fact also buttresses the unconscionability of the Arbitration Agreement because a determination of unconscionability as to that Agreement should take into account all of the attendant circumstances surrounding the Arbitration Agreement, including the nature of the contract in which the purported arbitration clause.

### III.    CLAIMS

### COUNT ONE:  DECLARATORY JUDGMENT
**(The Arbitration Agreement in the Agreement Is Unconscionable)**
*__**REQUEST TO ENJOIN PENDING ARBITRATION PROCEEDINGS**__*

131.    Ed's re-alleges and incorporates all other allegations of this Complaint as if set forth fully herein.

132.    By instituting arbitration proceedings, Defendant is taking the position that the Arbitration Provision is valid.

133.    However, for all of the reasons delineated herein, and to be further shown at trial, Ed's position is that the Arbitration Provision is invalid as it is procedurally and substantively unconscionable, and is contained within an Agreement that likewise is procedurally and substantively unconscionable.

134.    Thus, an actual and present controversy exists between Ed's and Defendant as to the validity of the Arbitration Provision.

135.    Absent this Court's intervention, irreparable harm may occur in that Ed's will, at the least, incur the expense of having to arbitrate non-arbitrable claims, and there is the very real risk of inconsistent decisions on many of the key issues raised herein.

136.    The Court's use of its injunctive authority is necessary to prevent such potential, irreparable harm.

137.    As Defendant, through arbitration, seeks only monetary relief, no prejudice that cannot be cured by the addition of interest will befall Defendant if temporarily enjoined from proceeding with arbitration.

**WHEREFORE,** Ed's seeks a declaration that the Arbitration Provision is invalid, along with a Preliminary Injunction enjoining Defendant from any further participation in the

arbitration proceedings it already improperly commenced, Ed's attorneys' fees, and all other relief that the Court deems just and proper.

## COUNT TWO:  DECLARATORY JUDGMENT

**(The Entire Agreement Is Invalid Because It Is Wholly Unconscionable)**
*__**REQUEST TO ENJOIN PENDING ARBITRATION PROCEEDINGS**__*

138.    Ed's re-alleges and incorporates all other allegations of this Complaint as if set forth fully herein.

139.    An actual controversy exists between Ed's and Defendant as to the validity of the Agreement in its entirety.

140.    Defendant's stance is that the Agreement is valid.

141.    It now is clear to Ed's, however, that the Agreement is invalid as it is both procedurally and substantively unconscionable as a matter of law for, *inter alia,* the reasons delineated herein.

142.    Absent this Court's intervention, irreparable harm may occur in that Ed's will, at the least, incur the expense of having to arbitrate non-arbitrable claims, and there is the very real risk of inconsistent decisions on many of the key issues raised herein.

143.    The Court's use of its injunctive authority is necessary to prevent such potential, irreparable harm.

144.    As Defendant, through arbitration, seeks only monetary relief, no prejudice that cannot be cured by the addition of interest will befall Defendant if temporarily enjoined from proceeding with arbitration.

**WHEREFORE,** Ed's seeks a declaration that the Agreement is invalid, along with a Preliminary Injunction enjoining Defendant from any further participation in the arbitration proceedings it already improperly commenced pursuant to the invalid Agreement's

unconscionable Arbitration Agreement, Ed's attorneys' fees, disgorgement and return of the net total amounts Ed's has paid to Defendant, and all other relief that the Court deems just and proper.

## COUNT THREE:  DECLARATORY JUDGMENT
### (The Agreement is Void Because it Violates Illinois Insurance Regulations)

145.    Ed's realleges and incorporates all other allegations of this Complaint, as if set forth fully herein.

146.    An actual controversy also exists between Ed's and Defendant as to the validity of the Agreement under Illinois insurance regulations, and whether and to what extent Ed's has any further obligations to Defendant.

147.    Despite being characterized as a reinsurance participation agreement, the Agreement is not part of a reinsurance transaction, because Ed's pays insurance premiums directly to Defendant, the purported "reinsurer," which in turn purportedly makes payment to California Insurance and Continental Casualty, the primary insurers.

148.    Rather, if anything, the Agreement is a disguised "retro" policy, because it provides that estimated premiums be paid to Defendants and deposited in a segregated cell, which is then allegedly used to pay the California Insurance and Continental Casualty policy premiums and other obligations.

149.    The actual premiums due under the Agreement are based on the results of purported audits of Ed's employment records along with the use of a wholly arbitrary "Loss Pick Containment" factor.

150.    Upon information and belief, Defendant disguised the true nature of the Agreement in an attempt to circumvent certain insurance laws in Illinois, including, *inter alia*:

          •    It is unlawful to transact business within the State of Illinois

without a Certificate of Authority from the Insurance Director. (215 Ill. Comp. Stat. §5/121-2);

• Captive insurers must apply for Certificates of Authority. (215 Ill. Comp. Stat. §5/123(c)-2);

• Workers compensation rates must be filed along with the manual of classifications, rules and rates, rating plans, and modifications thereto within 30 days of such rate's effective date. (215 Ill. Comp. Stat. §5/457);

• Captive insurance companies are required to make annual reports. (215 Ill. Comp. Stat. §5/123(c)-9); and

• Illinois also has captive capital and surplus minimums. (215 Ill. Comp. Stat. §5/123(c)-3 and 123(c)).

151. Defendant, either directly or through its agents, has, *inter alia*, collected premiums and other assessments for contracts of insurance, and transacted matters subsequent to the execution of contracts of insurance and arising out of them.

152. Defendant is not qualified or authorized to do business as an insurance company in Illinois and, upon information and belief, is in violation of each of the above-delineated regulations.

**WHEREFORE,** Ed's seeks a declaration that: (a) the premiums Defendant billed Ed's under the Agreement were arbitrary, excessive, and illegal; and (b) the Agreement is unenforceable as a matter of law in light of Defendant's numerous violations of Illinois insurance regulations such that Ed's further seeks the disgorgement and return of all amounts Ed's has paid to Defendant, his attorneys' fees, and all other relief that the Court deems just and proper.

## COUNT FOUR:  FRAUDULENT MISREPRESENTATION
### (Fraudulent Inducement by Concealment)

153.    Ed's re-alleges and incorporates all other allegations of this Complaint as if set forth fully herein.

154.    Defendant, by and through its agents and representatives, intentionally and fraudulently misrepresented to Ed's material facts about the expertise of their insurance agents, the ability of Defendant to conduct insurance business in Illinois, the true nature of the Agreement, the excessive fees, surcharges, penalties, and premiums contained in the Agreement, among other misrepresentations.

155.    Specifically, by and through its agents, Defendant did not reveal, while having a duty to so reveal, all of the material and onerous terms emphasized herein, as well as others within the Agreement.

156.    Ed's reasonably relied on all of these affirmative misrepresentations and fraudulent omissions in deciding to do business with Defendant and ultimately entering into the Agreement.

157.    But for these affirmative misrepresentations and fraudulent concealment of material facts, Ed's would not have entered into the Agreement with Defendant.

158.    As a result of Defendant's numerous intentional affirmative fraudulent misrepresentations and material omissions, Ed's has suffered damages that include, but are not necessarily limited to, payment of excessive fees, surcharges, penalties, and premiums to Defendant.

159.    There is clear and convincing evidence that Defendant's actions were intentional, fraudulent, malicious, and/or reckless, warranting the imposition of punitive damages.

**WHEREFORE,** Ed's seeks the disgorgement and return of all amounts Ed's has paid to Defendant, his attorneys' fees, punitive damages, and all other relief that the Court deems just and proper.

## COUNT FIVE:  NEGLIGENT MISREPRESENTATION

160.    Ed's re-alleges and incorporates the allegations of all other paragraphs of this Complaint as if set forth fully herein.

161.    Defendant, by and through its agents and representatives, negligently misrepresented to Ed's material facts about the expertise of their insurance agents, the ability of Defendant to conduct insurance business in Illinois, the true nature of the Agreement, the excessive fees, surcharges, penalties, and premiums contained in the Agreement, among other misrepresentations.

162.    Specifically, by and through its agents, Defendant did not reveal, while having a duty to so reveal, all of the material and onerous terms emphasized herein, as well as others within the Agreement.

163.    Ed's reasonably relied on all of these affirmative misrepresentations and negligent omissions in deciding to do business with Defendant and ultimately entering into the Agreement.

164.    But for these affirmative misrepresentations and fraudulent concealment of material facts, Ed's would not have entered into the Agreement with Defendant.

165.    As a result of Defendant's numerous negligent misrepresentations and material omissions, Ed's has suffered damages that include, but are not necessarily limited to, payment of excessive fees, surcharges, penalties, and premiums to Defendant.

**WHEREFORE,** Ed's seeks the disgorgement and return of all amounts Ed's has paid to Defendant, his attorneys' fees, and all other relief that the Court deems just and proper.

## COUNT SEVEN:  UNJUST ENRICHMENT

166.    Ed's re-alleges and incorporates all other allegations of this Complaint, as if set forth fully herein.

167.    Over the course of several years, Ed's paid to Defendant hundreds of thousands of dollars in premiums, receiving nowhere near that amount of value in return.

168.    For all the reasons aforementioned, the relationship Ed's had with Defendant, pursuant to which Ed's paid such premiums, ultimately is invalid.

169.    Thus, the premiums Defendant collected were improperly collected, and it would be unjust for Defendant to retain such funds.

170.    By retaining such funds, Defendant has damaged Ed's.

**WHEREFORE,** Ed's seeks the disgorgement and return of all amounts Ed's has paid to Defendant, his attorneys' fees, interest, and all other relief that the Court deems just and proper.


Respectfully submitted,


_____
Daniel F. Harvath  #MO57599
**THE DANIEL HARVATH LAW FIRM, LLC**
P.O. Box 440393
St. Louis, Missouri 63144
danielharvathlaw@gmail.com
*Plaintiff's Attorney*